## The inventory of the Goods of FELICITA McCREADY.

WHETHER an attachment for refusing to return an inventory can issue against an administratrix, who is a married woman—*Quere?* An order made in such case, that husband and wife show cause, &c.

MORRIS S. MILLER, *for the Administratrix.*

THE SURROGATE. This is a motion for an attachment, under 3 *R. S., 5th ed., p.* 179, against a married woman, to whom letters of administration were issued before her marriage, and who refuses or neglects to file an inventory of the assets of the estate, as required by law.

It is insisted that, because of the salutary rule of the Common Law, which held the wife to be under the dominion of her husband, and made him liable for her acts, that this Court cannot issue an attachment against the administratrix, but must issue it, if at all, against her husband. The question is an interesting one, and deserves careful examination the more since the Legislature has abolished most of the legal disqualifications under which married women formerly labored, and, as it would seem, without restoring them to the liabilities of single women in all cases.

The Common Law declared a *feme covert* exempt from arrest in ordinary cases. (1 *T. R.*, 486.) Yet this rule had its exceptions. Thus, if she obtained credit by pretending to be single, she might be arrested. (1 *New. R.*, 54; 1 *Bing.*, 344; 2 *Marsh*, 407; 7 *Taunt.*, 55.)

Under the Common Law, the husband was liable for

his wife's torts; and the reason for that rule was given, that the wife was under the control of her husband. So, a wife cannot commit a crime in the presence of her husband. (1 *Black. Com., p.* 445.)

And actions for torts, committed by a woman before her marriage, as well as those committed by her during coverture, must be brought against husband and wife jointly. (*Co. Lit.*, 351; *Bac. Abr., Tit. Bar. & F.*)

In the case of *Hasbrouck* v. *Weaver*, 10 *John.*, 247, the Supreme Court held the husband liable for a forfeiture under a penal statute, incurred by his wife in selling liquors, although in his absence and against his directions. (*See* also 2 *Kent Com., p.* 149; *Reeve's Dom. Rel.*, 72; 6 *Mod.*, 17; 1 *Mod.*, 8; *Graham's Pr.*, 127, *and cases there cited.*)

The Code has not changed the rule of the husband's liability for his wife's torts. (2 *Hilton*, 179.)

But the present is a proceeding in the nature of a contempt, and of a quasi criminal character.

In *Bunyan* v. *Mortimer*, *Madd. & Gold.*, 278, a bill was filed against a husband and wife, in respect of a demand against the wife as executrix; and it was held by Sir J. Leach, Vice-Chancellor, that an attachment could not issue against the wife, at least until an order had been obtained that she should answer separately; and that she must have notice of that order.

In *Parnwell* v. *Taylor*, 1 *Term R.*, 96, Lord Eldon decided that a writ of *ne exeat regno* against a *feme covert*, executrix or administratrix, could not be sustained.

If a *feme covert* be an executrix or administratrix, the husband had a joint interest with her in the administration of the estate, and could act without her assent; and in all proceedings relative to her estate, either the party moving or the executrix might set up the joint liability of the executrix and her husband; and the husband would then be cited jointly with his wife to abide the orders of the Court in the due administration of the estate. (*Woodruff* v. *Cox*, 2 *Brad.*, 153.)

And if a man married an executrix after she had taken out letters testamentary, he was liable with his wife for her acts as executrix both before and after marriage, (8 *Paige Ch.*, 37), and was liable for a devastavit of his wife, because she had no power to act alone. ( 1 *Sch. & Sep.*, 173.)

The effect of marriage after letters granted was the same as the grant of letters after marriage, with the consent of the husband; that is, it made the husband jointly responsible with his wife. He was treated in most respects as a joint or co-executor. (2 *Brad.*, 153.)

In *Clough* v. *Dixon*, 8 *Sim.*, 598, the Court had considerable doubt whether the next of kin could make a widow, who was administratrix, responsible for a devastavit, which was the act of her husband during coverture.

It may be said that these cases do not accord with the spirit of our recent legislation, and are modified and controlled by it, if not rendered obsolete. But the law which gives the husband the legal right to control the acts of his wife is not changed. His dominion over her property is lost, but I am not aware that he has lost the right to direct her conduct.

By the old law of England, a man might give his wife moderate correction; for, as he was to answer for her misbehavior, the law considered it reasonable to intrust him with this power of restraining her by domestic chastisement, "in the same moderation that a man is allowed to correct his apprentices or children, for whom the master or parent is also liable, in some cases, to answer." And the husband was prohibited from using any violence to his wife, *aliter quam ad virum ex causâ regiminis et castigationis uxoris suæ licite et rationabiliter pertinent.*

The Civil Law gave the husband the same, or even a larger authority over his wife; allowing him, for some misdemeanors, *flagellis et fustibus acriter verberare uxorem;* for others, *modicam castigationem adhibere.* (1 *Black. Com.*, *p.* 445.) And a high authority shows that

a man might whip his wife with a stick no larger than his thumb. But in England, as Blackstone further says, in the politer reign of Charles I, this power of correction began to be doubted by the Judges. (1 *Sid.*, 113; 3 *Kibb.*, 433.) And it was said a wife might now have security of the peace against her husband (2 *Lev.*, 128); or, in return, a husband against his wife. (*Stra.*, 127). "Yet, the lower rank of people, who were always fond of the old Common Law, still claim and exact their ancient privileges; and the Courts of Law will still permit a husband to restrain his wife of her liberty in case of any gross misbehavior." And a learned commentator on Blackstone's Commentaries judiciously remarks, that "husband and wife, in the language of the law, are styled '*baron* and *feme;*' and that the word *baron* attributes to the husband a not very courteous superiority. But we might be inclined to think this merely an unmeaning, technical phrase, if we did not recollect that, if the *baron* kills his *feme*, it is the same as if he had killed a stranger or any other person; but if the *feme* kills her *baron*, it is regarded by the law as a much more atrocious crime; as she not only breaks through the restraints of humanity and conjugal affection, but throws off all subjection to the authority of her husband. And, therefore, the law denominates her crime a species of treason, and condemns her to the same punishment as if she had killed the king." (1 *Black. Com., p.* 445, *note* 49.)

These were the chief legal effects of marriage, during the coverture; "upon which we may observe, that, even the disabilities which the wife lies under, are, for the most part, intended for her protection and benefit; so great a favorite is the female sex of the laws of England." (1 *Black. Com.*, 445.)

As the case at bar is presented, I think the legal presumption must be applied, that the administratrix returns no inventory, because her husband will not allow her to do so.

The motion for an attachment, on the papers before me, I shall deny, without prejudice to a renewal thereof, if gentler means fail, and if the presumption of coercion can be rebutted to the satisfaction of the Court. Let there be an order that the husband and wife, jointly, show cause why an attachment should not issue against the husband or against both.